Good morning. Welcome to the Fourth Circuit. We have a slightly abbreviated docket this morning and our first case is Fox v. Colvin. Ms. Hall, we'll be glad to hear from you. Ms. Hall, may it please the court. The plaintiff in this case, Mr. Fox, suffers from a rare disease called chronic inflammatory demyelinating polyneuropathy or CIDP. The disease involves the immune system which attacks the nerves and destroys the myelin sheath which encase the nerves. This leads to dysfunction with results of pain, motor weakness, sensory loss and difficulty walking. Now the ALJ in this case, I was just going to say we're fairly familiar with the facts and you have a limited time for these types of cases so you make your argument as you see fit but if you want to tell us why the district court and the ALJ were wrong that would be a good place to go. All right. Thank you. The ALJ aired here because the listing for peripheral neuropathy 1114 was implicated in this case. The ALJ summarily stated that the listing was not met without considering the criteria of the listing or how the facts compare to that criteria. So in evaluating substantial evidence before we get there we have to see whether or not the ALJ gave sufficient reasons. Yes, sir. And you think the reasons are insufficient. Yes, sir. The language specifically was in conclusion the undersigned has considered in particular sections 90 and 1114. That's the very same language that the ALJ used in Radford versus Colvin regarding listing 104 in which this court found was insufficient because you did not consider the criteria of the listing and how the facts of the case compared to those criteria. But do we have any public authority that we could uphold the ALJ under a harmless error analysis? I don't believe so, your honor, because for harmless error to be implicated there has to be no conceivable way that the listing could have been met, that it could have been implicated either by its criteria or medically equaling those criteria. And here we have a prima facie case of the listing. We have a disorganization of motor function in two extremities resulting in sustained disturbance of gross industrious movements or gate and station. In Mr. Fox's case his gate is repeatedly noted to be disturbed. At first he started out with. But there are times when his gate is noted to be fine, the ER visit. What about that? Well, your honor, the ER visit was earlier on in the record. Additionally, he was being seen for low back pain. ER doctors are notorious for very perfunctory exams of people, particularly when they're dealing with an acute situation like a back pain case. We take judicial notice that the emergency room doctors are not particularly competent. I would not say that they're incompetent, sir, but that they have a very heavy caseload, so to speak, many people that they have to see, rounds to make. And they're only going to be dealing with the acute situation that the person is complaining of. Notably, your honor, in this case the treatment notes of Dr. Armstrong, who is the neurologist, the specialist, who saw Mr. Fox repeatedly over the course of a year and a half with about seven or eight examinations on record, none of those treatment notes were considered in the ALJ's decision. He only discussed an ER visit for back pain and the initial neurological consultation with Dr. Jones, his previous neurologist, which was earlier on in the record. Nothing from the year and a half. Your point would be that the ALJ could have considered those things, but from reading the opinion you can't tell. You cannot tell. And that's your point. Yes, sir. From the opinion you can't tell if he considered it. This is particularly important because not only is Dr. Armstrong the person whose records make up the vast majority of the treatment record that we have, the most recent records, and this is a progressive disease, CIDP, it gets worse over time. He is also the individual who rendered a medical opinion in this case, the only treating physician to give a medical opinion on function, which goes to the second point in this case, that the ALJ just very conclusively stated that the non-exertional limitations of the doctor accepted, the exertional ones are not because they are not supported by the record. However, at no point in his decision cites what records detract from Dr. Armstrong's opinion. He doesn't even consider a single treatment note in his decision. If I can take you back to your first argument on the sufficiency of the ALJ's explanation, in terms of what an appellate court would do, are you saying that there was error by the ALJ or there's simply insufficient description to permit the appellate court to review it? Both, Your Honor. In fact, the district court actually used the language that the ALJ erred by not sufficiently articulating listing analysis. But the district court then went on to say, but we ourselves can go on and determine that that listing is not met. Well, didn't the doctor find, or the ALJ find that Fox's limitation was mild? He characterized them as mild, but Dr. Armstrong characterizes neuropathy as severe. There's no discussion of those characterizations in the ALJ's decision. And saying that he has mild to moderate limitations is not vocationally relevant terms. They don't tell us how much he can walk, how much he can sit, how much he can lift, which are things that Dr. Armstrong outlined, which the ALJ did not sufficiently consider in his decision. So your strongest argument is the lack of weight given to the Fox's treating physician. That's your strongest argument? I would say that the, there are two glaring errors here, and the ALJ's decision on both of them was just very deficient. The decision was very short. There's only a couple of paragraphs that have any substance. Most of it was boilerplate. We don't know what he was thinking, and this court, as well as the district court, are prevented from engaging in substantial evidence review where we don't have a sufficient basis for the ALJ's finding. Despite all of these notations of severe neuropathy, of difficulty walking, an unsteady gait, a broad-based ataxic gait, which means without order, disorganized, none of the gait disturbances were considered in the decision. He only noted the one time in the ER where he seemed to be able to get around okay. He didn't consider any of the treatment notes from the expert who saw him repeatedly. And his listing analysis does not even list the criteria of the listing. In Radford, the ALJ actually did note the criteria, he just didn't compare the facts of the case to those criteria. And there was evidence, it was found to be error, because there is evidence in the case record that Mr. Radford met the listing. There's also evidence in this case record of all the relevant criteria for listing 1114. So both of the errors are pretty glaring. I think that the error in not analyzing the listing sufficiently is highlighted by the fact that we have a treating physician opinion on a rare disease that is not something that people see every day. And the ALJ did not sufficiently analyze that opinion and certainly did not analyze the criteria and facts of listing 1114. He simply said, I have considered it. And that's the very language that was used in Radford. As I noted, there's a prima facie case here. There's disturbance of gait. There's numerous notations of motor and sensory loss. There are also, again, evidence of this disorganization. We have destruction of the myelin sheaths around his nerves, which is the cause of his gait problems. Additionally, the ALJ never actually even mentioned that he underwent IVIG, which is intravenous immunoglobulin therapy for his CIDP. He only made the one notation where he forgot to take his diabetes medication. The problem is with citing noncompliance as a reason to not meet the listing is that this court noted in Preston v. Heckler that for noncompliance to be the basis for denying benefits, so security must make a finding by substantial evidence that the cause of the symptoms is due to noncompliance and that the symptoms can be reasonably remedied by the ALJ of that. In fact, there's not even an acceptable medical source on record that says that his disabling symptoms are caused by noncompliance and that they can be remedied with compliance. Not even the state agency physicians who work with defendants said that. So certainly, that cannot be the basis for denying here. The ALJ never made a finding that that was the cause of his symptoms. Well, could Fox meet the 1114 listing if he failed to take his diabetes medicine? Certainly. If the diabetes medicine is not the cause of his continuing neuropathy. Additionally, Your Honor, the CIDP, the chronic inflammatory demyelinating polyneuropathy, is an immune disorder. It's not going to be ameliorated by taking diabetes medication. It was the IVIG, the immunotherapy that he underwent that was targeting that. He was completely compliant with his IVIG medication and it just didn't work. It was noted to get no relief from that medication, so he has these criteria in spite of prescribed treatment. Even though there is a notation that he forgot to take his medicine for diabetes one day, which is a secondary condition from which he suffers. Again, there's no finding by the ALJ that that was the cause of his problems and that if he had started taking his medication, even that would have made his disabling symptoms no longer disabling. That is a post hoc reasoning that was provided by the government and that was adopted by the district court. But if the ALJ determined on the record that the failure to be compliant with his diabetes regimen was a contributing factor of some level with the neuropathy, what would happen then? If the ALJ found that his neuropathy was being caused by his noncompliance and that finding was supported by substantial evidence and he's citing acceptable medical sources who state this is the reason he's having all these problems is because he's not taking his medication, then I would say that the ALJ's decision would be a lot more complete. We would have a situation where 1114 may not be able to be met because he did not do things in spite of prescribed treatment. But that's another note I would come to is that it's in spite of prescribed treatment, which again, there's a lot of case law, a lot of regulations on this whole compliance with medication issue. There has to be substantial evidence and you have to make a finding that that is the cause and that it could be remedied reasonably by compliance. There's no finding of that on the record. So as you noted, if the ALJ went through that analysis and said that there certainly seems to be a lot of evidence of this and his doctor said he would be better if he complied, then we would be in a different situation. But that's not where we're at today. The ALJ's decision was very perfunctory. The only mention of noncompliance, he cites the same note as the only note that the district court cites. And he says that this generally undermines his credibility. But as this court noted in Mascio v. Colvin, general dispersions of credibility don't help us understand the functional limitations that a person suffers. There has to be a specific bridge between problems with credibility and why that means that they maybe can walk more than they say they can or they can sit more than they say they can. We don't have that here. He just says he's generally not credible. And of course, as I noted, he did not mention his IVID treatments were CIDP at all. So what's the bottom line? What's the relief you see here? Remand. I think that remand is justified under Radford. In Radford v. Colvin, they found that the district court improperly reversed by finding that post hoc that the listing was met even though there was no basis in the ALJ's decision to review that listing finding. And it was found that remand was the more appropriate grounds because the court is prevented from engaging in substantial evidence review where the ALJ does not articulate a rationale, particularly in cases like this where there's at least conflicting evidence of the listing being met. Thank you very much. You've got some rebuttal time left. Ms. Simivon, did I get that right? Very good. I'll be glad to hear from you. Thank you, Your Honors. Now, here I'd like to start with the issue of the listing. And this is a case in which Radford simply does not apply. The facts in Radford were substantially more complicated. They were more conflicted and over a longer period of time. By contrast, we're dealing with a simpler record. And although the claimant here has tried to point to ambiguity within the record, this is in a level of ambiguity that is not material to whether or not the listing would in fact be met. Now, even if we look to the evidence of the gait that the claimant has shown us here, where there is some difficulty, it's broad-based, even if you look at the tandem walking being impaired, the fact remains that all of these metrics measuring gait were done without assistance. Even though the claimant testified that he used a cane at the hearing for the previous two years, any time you look at an examination in the record, this gait evolved. But all of that might be in the record, but there's none of that in the ALJ's decision. The ALJ just makes a pretty conclusory decision with no reasoning or cite to the treating physician at all. So how can we conduct a meaningful review of that when we are not to be the back-finders here? Well, Your Honor, certainly. More thorough discussion at Step 3 would have been preferable. Any discussion? Where is there any discussion of the ALJ's reasoning for finding a lack of credibility or a reasoning for finding, as the ALJ did? Rationale for finding a lack of credibility on transcript pages, I believe primarily 21 and 22. Although the claimant has argued that the ALJ's decision is fairly short and contains little substance, I would remind the Court that this is a- Which section? You're looking at pages 20 and 21 of the administrative record. Yes, Your Honor. You have section 4 and then section 5. Which is the one that deals with whether or not the claimant meets the listed impairment? That appears to be section 4. Section 4 in terms of the- Oh, I see what you're saying, the numbers of the overall findings in the ALJ's decision. Yes, Your Honor. Now, most of the discussion of the pertinent evidence to the listing does not occur within the actual Step 3 analysis, but this Court has previously explained that simply because the evidence is discussed elsewhere in the decision does not mean it cannot also be considered at other steps. So the ALJ certainly focused his decision on the Step 4, Step 5 analysis in terms of the RFC, but that does not mean that the evidence he discussed does not apply equally to the listing impairments here. There seems to be a trend of sorts, different circuit court opinions, that seem to say that the courts of appeal are not going to go hunt through the woodpile to find the right log. Later on in the opinion, the ALJ needs to go ahead and set it out and tell us this is where I'm discussing the listing and here are my reasons for it. This is why or why not the claimant doesn't meet the particular listing in that case, because otherwise you're left to kind of go hunt through the discussion of the other points to see if any of those relate back to that. And it doesn't seem like that's intended to be the appellate court's function. Your Honor, to that point, it's a matter of, at the end of the day, what will a remand serve? And although, again, certainly, Your Honor, it's easier to have the findings discussed in full at both steps of this potential evaluation process, that does, however, also create more work. It's duplicative. And if you're looking at an ultimate substantive level, even if, again, in a perfect world, the court shouldn't have to go through and look to different types of evidence, if you're looking at the end of the day in terms of achieving the correct result with this case, this is the proper course to look to the evidence that the ALJ did, in fact, discuss and acknowledge that the listing criteria in this context would not be fulfilled. So any error in our case... The ALJ had the benefit of your very excellent brief. It seems like they could have fit things into the peg holes pretty well. Unfortunately, the ALJs have a substantially higher caseload than I do. They are responsible for adjudicating hundreds of decisions a year. There are hundreds of thousands of ALJ decisions written every year. But it's the process that Judge Agee is talking about. How simple can it be or how hard can it be to just do what he's suggesting? Here's the one point, these are the reasons, et cetera. Otherwise, we get trapped into looking at the records, trying to find an answer that he should have given us to start with. Well, to this point, Your Honor, I don't write the administrative logic decisions. I couldn't tell you how difficult it is to create separate articulations at both steps. And again, ideally, the entire decision would be fully articulated. Every piece of the record would be mentioned and discussed in terms of its import. But in looking at the case that we have, what's ultimately relevant, again, I have to bring the Court back to the substance of the underlying case. The way that this case is ultimately distinct from Radford is because this case does not present such depth and ambivalence within the record. And that is what the Court in Radford cited as being material to the importance of the articulation here. It does not make us sort of the fact-founders in the first instance. I'm sorry, could you repeat the question? Wouldn't following that train sort of make us the fact-founders in the first instance? No, Your Honor, because the ALJ did in fact discuss the evidence of record. Although the claimant has stated that the ALJ did not discuss Dr. Armstrong's treatment notes, the ALJ in fact cited the exhibits in which they are listed. Look, for example, Exhibit 14F, that's discussed in the ALJ's case. So because the ALJ did indeed discuss the evidence of record, and even discussed the evidence of diminished sensation that the claimant is relying on in an attempt to prove her case, it's sufficiently clear to permit the Court to review, to see that the ALJ was aware of this evidence, and that being aware of this evidence would not have found that the listing criteria were met. So this is not going beyond what the ALJ was aware of and fact-finding in the first instance, Your Honor. It's asking us to do what the ALJ should have done. Asking you to do what the ALJ should have done in terms of articulating? Yes, writing an opinion that articulates the reason for the opinion. As you said, the ALJ has a caseload. We have our own caseload, too. Yes, Your Honor, to that point, again, this harmless error is something in which a lower judge may make a mistake, an administrative law judge may make a mistake, but that doesn't mean that the case itself should be overturned simply because of that mistake. So on that point, even if it may not seem – I don't want to use necessarily the word fair in a sense – but even if it may not be the way that things optimally should work, it's still a way that they are capable of working if this Court can recognize that the ALJ at least discussed the evidence, that the evidence, even when viewed in the best possible light, does not indicate that the listing is sent. When you look to the end of the day, if you remand the case, what's going to happen? So if we remand the case and the evidence does not, in fact, support the listing or potentially support the listing, then ultimately that's going to be a fruitless remand that will result in a much higher expenditure of resources in the end than if this Court were to have said essentially the ALJ did acknowledge the evidence, the ALJ did review the evidence. The ALJ may not have articulated it properly, but we can still trace the path of this reasoning. We can still determine that the ultimate finding that the listing is not met is supported by substantial evidence. Are you aware of any public authority in this circuit that could use a harmless error analysis in a social security context? I believe it's Matt. I'm forgetting the pronunciation of the case. But Nichols, Your Honor, has applied, Nichols v. Shalala, I believe it was, applied harmless error to social security cases. Certainly, Shinseki v. Sanders applies, Supreme Court case applies harmless error to social security cases. So certainly harmless error is capable of applying in a case like this. Now to, I would also just like to briefly touch on a point with respect to the evidence of gait. Now the claimant has referenced an ataxic gait in the record. From going through the record, I have. What kind of gait? Ataxic, which she described as disorganized. But I have not seen any references to an ataxic gait in the record. It may have been slow or steady, but again, this was also an assisted gait.  So in short, the claimant has not demonstrated the disorganization of function, the loss of most or all of the proper characteristics that would be necessary to meet the listing. Although the claimant has also brought attention to the issue of failure to follow prescribed treatment, this is ultimately distinct from the provision in the listing that the impairments at issue must exist in spite of a failure to follow recommended treatment. Well, are you asking us to find in the first instance that if a claimant can walk without assistance, he categorically cannot satisfy the 11.14 listing? Your Honor, this would not be finding in the first instance. Rather, it's a simple reflection of the fact that in light of the terminology that the listing uses, disorganization of function, this is talking about a very significant level of impairment here, and that's where the AOJ properly characterized the loss of sensation and muscle strains as mild. This does not rise to the level. So, Your Honor, you would not be finding in the first instance that a mere ability to walk is incapable of satisfying the listing, but rather recognizing, as the AOJ did, that in light of the level of impairment shown here that's ultimately mild, that does not rise to the level of the listing. And the fact that the claimant is still capable of walking unassisted is simply one indication of that. Now, with respect to the failure to follow prescribed treatment, this is, as explained in the brief, distinct from the regulatory and the SSR ruling that discuss a need to further develop evidence after a finding of disability is found. Now, 20 CFR section 404.1530 or SSR 8259 could conceivably apply to any listing, but in this particular listing they wrote in that criterion separately, indicating that we are dealing with something different here. So there is nothing in the listing that references the regulation or the SSR in terms of a need to show that adhering to treatment would be prospectively expected to restore ability to work. That would, in effect, be reading into the listing a requirement that is not there in the plain text. So because of that, the failure to follow recommended treatment for diabetes, which Dr. Armstrong, again, on whose opinion the claimant relies, said was at the very least a significant contributing factor to polyneuropathy. And again, polyneuropathy can occur in diabetic patients. There's no indication to suggest that these are separate diagnoses here. And where Dr. Armstrong is saying that diabetes is having an effect on his polyneuropathy and where there are three different treating sources, including Dr. Armstrong, who have said that the claimant is chronically noncompliant with his diabetes medications, that would further preclude the listing apart from the failure to satisfy the other criteria here. Now, moving to Dr. Armstrong's opinion, again, the ALJ did cite to and discuss Dr. Armstrong's notes. He did not reference Dr. Armstrong by name every time he did so. But again, look to Exhibit 14F, that's discussing the ALJ's decision. The ALJ did provide reasons for discounting Dr. Armstrong's opinion, that they were not supported by the evidence. And the ALJ's discussion of the evidence demonstrates that the opinion itself is not supported on that point. Just making sure I've hit all the points, Your Honors. Do you have any further questions that I could assist you with? Thank you very much. Thank you, Your Honors. Ms. Hall, you have some time in rebuttal. Yes, thank you. A few quick follow-ups. As far as the ataxia is noted, broad-based gait is a form of ataxia, because the individual has difficulty coordinating their movements and they're having to try and stabilize themselves by having a broader gait. As far as the need for assistance, as an assistive device, under 10B2B, which talks about ineffective ambulation, there is not a need to have an assistive device in order to be unable to ambulate effectively. The individual can be slow. They can be unsteady and not be able to ambulate effectively, because they can only go short distances at a time. They cannot complete tasks in a timely manner, which was noted by Dr. Armstrong. Additionally, Dr. Armstrong never stated that Mr. Fox was noncompliant. He did note that he had trouble finding someone who would accept his Medicaid so that he could get a primary treatment provider for regular prescription of metformin. However, Social Security ruling 967P notes that an inability to find treatment is a justifiable excuse for being out of medication at times, because it has not actually ever been prescribed at that point. You cannot be noncompliant with what has not been prescribed. There were times where he was in between doctors, but when he was with doctors and was noted to be compliant with medication, his neuropathy still got worse because of CIDP, which again is an autoimmune disorder. These disorders are very much distinct. They are different causes. One is endocrine-related diabetes, and one is autoimmune. Additionally, this argument that something can be satisfied at step four, even if it wasn't talked about at step three, the listing analysis, doesn't carry weight in this case. Even if we were accepting that that was permissible and making this court's job more difficult, the evidence of his disturbed gait was not talked about at any point in the decision by the ALJ. He only noted an earlier note at the beginning of the record that he had an independent steady gait. All of the broad-based gait, slow, shuffling, unsteady, none of that was mentioned in the decision, so there was not consideration of the listing criteria at another point in the ALJ's decision, and much less at step three. Additionally, regarding harmless error, the defendant cites the Shinseki v. Sanders, which was a case before the Supreme Court involving Veterans Administration harmless error, procedural error. The individual, Mr. Sanders, was not notified of his ability to file an appeal. He then went ahead and filed the appeal anyway, so the error was found to be harmless because even though he wasn't given the statutory notice, he filed his appeal in a timely manner. There was no conceivable way in which he could be harmed. The standard in Social Security is that there has to be no conceivable way that the individual could be harmed. Here, another result could have happened. The listing could have been found to be met if he had properly analyzed the listing, as there's evidence of all the criteria in the case. Are there any other questions? Thank you very much. Thank you, sir. We'll move on to our next case.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker